UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :

READING INTERNATIONAL, INC.; CITADEL
CINEMAS, INC.; and VILLAGE EAST LIMITED        :
PARTNERSHIP,

                                               :

                  Plaintiffs,                       03 Civ. 1895   (PAC)
                                               :

        - against -                             :

                                               MEMORANDUM
OAKTREE CAPITAL MANAGEMENT LLC; ONEX    :            <u>OPINION & ORDER</u>
CORPORATION; REGAL ENTERTAINMENT GROUP;
UNITED ARTISTS Theatre COMPANY; UNITED        :
ARTISTS Theatre CIRCUIT, INC.; LOEWS
CINEPLEX ENTERTAINMENT CORPORATION;       :
COLUMBIA PICTURES INDUSTRIES, INC.; THE
WALT DISNEY COMPANY; UNIVERSAL STUDIOS,    :
INC.; PARAMOUNT PICTURES CORPORATION;
METRO-GOLDWYN-MAYER DISTRIBUTION         :
COMPANY; FOX ENTERTAINMENT GROUP, INC.;
DREAMWORKS LLC; STEPHEN KAPLAN; and      :
BRUCE KARSH,

                                               :

                  Defendants.
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

       Plaintiffs Reading International, Inc., Citadel Cinemas, Inc. and Village East

Limited Partnership (collectively, "Village East" or "Plaintiffs"), the owners and operators of the

Village East movie theatre in Manhattan, located at the intersection of 2nd Avenue and East 12th

Street, bring this action under federal and New York State antitrust laws alleging illegal licensing

agreements between the large theatre chains and movie distributors.  Plaintiffs originally sued

fifteen major film exhibitors and distributors, as well as the asset management companies that

controlled two exhibitors, Regal and Loews.  After a motion to dismiss, see Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp.2d 301 (S.D.N.Y. Dec. 10, 2003), and a series of settlements, however, the action now proceeds only against Regal Entertainment Group, and its subsidiaries, United Artists Theatre Company and United Artists Theatre Circuit, Inc. (collectively, "Regal"),[1] which own and operate the Union Square 14 movie theatre at Broadway and East 13th Street, one block north and two and one-half blocks west of Plaintiff's Village East.  Plaintiffs seek relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 8 of the Clayton Act, 15 U.S.C. § 19.  They also assert ancillary claims under the Donnelly Act (New York's antitrust law), N.Y. Gen. Bus L. § 340(1), and New York common law for tortious interference with prospective contractual relations.  Regal, as the last remaining defendant, now moves for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  For the reasons discussed below, the Court grants Regal's motion in its entirety.

## BACKGROUND

A. The Parties

Plaintiffs own and operate a number of independent movie theatres in Manhattan, including the Village East Cinema located at Second Avenue and 12th Street in the East Village. (Am. Comp. ¶¶ 1-2.)  In 1991, the Village East was transformed into a seven-screen, 1,272-seat multiplex, on the site of what used to be a live, Yiddish-language theatre. (Id.)  The original character and landmarked interior architecture of the old theatre were preserved in the conversion. (Id.)

---

[1] United Artists Theatre Company and United Artists Theatre Circuit, Inc. were acquired by Regal in early 2002 and are subsidiaries of Regal Entertainment Group.  For purposes of this motion, Regal and its United Artists subsidiaries will be treated as one defendant.

Defendant Regal owns and operates the largest circuit of movie theatres in the United States, with a total of approximately 542 theatres containing 6,383 screens as of June 29, 2006. See http://investor.regalcinemas.com.  As of July 2005, this constituted 17% of the motion picture screens in the United States. (Regal's Local Rule 56.1 Statement ("56.1 Statement") ¶ 4.) Approximately 485 of Regal's theatres—with a total of 5,457 screens—are located in what are known as "sole exhibitor zones," meaning that Regal is the only exhibitor in the zone, with no competition from other theatres. See http://investor.regalcinemas.com/annuals (providing financial & SEC reports).  If distributors wish to play their films in these sole exhibitor zones (which they may or may not), they must deal with Regal.  One of Regal's many theatres is the Union Square 14 Theatre ("Union Square 14").[2] (Regal's 56.1 Statement ¶ 3.)

Oaktree Capital Management, LLC ("Oaktree") and The Anschutz Corp., asset management companies that specialize in obtaining the assets of bankrupt corporations, acquired control over Regal and United Artists when they emerged from bankruptcy in 2002. (Am. Compl. ¶¶ 74-75.)  At the same time, Oaktree and Onex Corporation ("Onex"), also an asset management company specializing in obtaining the assets of bankrupt corporations, acquired control over Regal's competitor, Loews Cineplex Entertainment Corporation ("Loews") when it exited bankruptcy around the same time. (Id. ¶ 73.)  Thus, Oaktree participated in the management of both Regal and Loews and placed its executives on the boards of directors of both companies. (Id. ¶¶ 4, 72, 76-78; Polansky Aff., Exs. 46 & 48.)  Oaktree ended the interlocking representation in June 2003, however, when its executive, Bruce Karsh, resigned

---

[2] The Union Square 14 opened in November 1998. (Regal's 56.1 Statement ¶ 5.)  It was owned and operated by United Artists until early 2002, when Regal acquired United Artists. (Regal's Local Rule 56.1 Statement ¶¶ 3 & 7.)

from the Loews Board of Directors. (Karsh Dep. 264, Aug. 12, 2004; Keeley Aff., Ex. 92.)

Oaktree sold its interest in Loews completely in July 2004. (Polansky Aff., Ex. 58.)

      B. Movie Licensing Practices

           Movies are distributed by companies known as "distributors," which license films

to theatres for exhibition.  In licensing a film to theatres, a distributor's primary goal is to

maximize the net licensing fees or "film rent" it receives.  The most common method of

calculating film rents in Manhattan is through a "90/10" deal. (Cotter Dep. 321-22; Cooper Dep.

224-25, Nov. 30, 2004.)  The arrangement requires a determination of the theatre's box office

ticket revenues for the film, and then subtracting the "house allowance"[3] for each auditorium in

which the film played. (Cooper Dep. 196-97, 224-25.)  The remainder is then split, with ninety

percent going to the distributor and ten percent to the theatre. (Id.)  The distributor also incurs the

costs of producing and shipping prints of the film, which can range from approximately $1,200

to $3,000. (Regal's 56.1 Statement ¶ 11; Pls.' 56.1 Statement Resp. No. 11)  To maximize net

film rent for a particular film, therefore, a distributor seeks to maximize ticket revenue relative to

costs.

           Not all distributors and exhibitors utilize the 90/10 arrangement.  According to

Plaintiffs, some use aggregates or settlement[4] instead.  Further, some 90/10 deals contain

---

        [3] The exhibitor negotiates a house allowance for each of its auditoriums the distributor. Historically, these "house allowances" have been based primarily on the costs the exhibitor incurs to own and operate its theatre.  (Def.'s Mem. at 4.)  The house allowance is based on factors such as the number of seats, show times, the length of run and other such variables.  Generally, house allowances are higher for auditoriums with more seats.

        [4] "Settlement" means that the formal agreement between the exhibitor and the distributor would be subject to renegotiation if the exhibitor would not make a sufficient profit on the deal under the formal terms. See Geoffrey Verter & Anita M. McGahan, Coming Soon: A Theatre Near You 4 (Sept. 24, 1998) (case study, on file with The Harvard Business School Publishing).

"floors," which are minimum percentages of the total weekly gross (notwithstanding any house allowance) that the exhibitor will pay if the 90/10 calculation results in a rental amount lower than the percentage floor.  (See Pls.' 56.1 Statement, Resp. No. 10.)

Distributors engage in a complicated, multi-step process to determine the optimal release pattern in order to meet their objectives for each film. (See Araujo Dep. 52-72, Apr. 27, 2005.)  First, the distributor determines when to release the film, taking into account when other distributors will be releasing their films. (Id.)  Next, a distributor determines how "wide" to release the film; that is, on how many screens to open the film, both nationally and regionally. (Id.)  This number may range anywhere from just a few screens to over three thousand screens nationwide.  Finally, if an area has more than one theatre, the distributor must select the specific theatre or theatres in which to open the film. (Id.)

Distributors and exhibitors have divided Manhattan into several "film zones" for purposes of licensing movies. (See Keeley Aff., Exs. 40 & 107.)  The theatres in a particular film zone are those thought to be "in substantial competition with one another," so that distributors would prefer not "to play them day and date," meaning that the film will not play simultaneously at that theatre and another theatre in the same zone. (Araujo Dep. 108.)  Because of the perception that theatres in a particular zone compete with one another, exhibitors within the film zones may request exclusive rights to a film.  These arrangements are commonly known within the industry as "clearance agreements."

C. Lower Manhattan Zone

One of the film zones recognized by industry professionals is the "Village zone" or "Lower Manhattan Zone," ("LMZ") which Plaintiffs assert is "the area from the Hudson to

East Rivers below 19th Street (excluding Battery Park City)."[5] (Pls.' Mem. Law Opp'n Summ. J.

6.)  Plaintiffs exclude Battery Park City, in which Regal operates another movie theatre, because

industry professionals consider Battery Park a separate film zone. (See Keeley Aff., Ex. 40.)

        According to Plaintiffs' count, approximately 350,000 people live in the LMZ,

making it one of the most densely-populated film zones in the United States. (Cotter Dep. 207.)

In addition, thousands of people who live elsewhere in Manhattan or New York City visit the

LMZ because of its broad entertainment options and convenient transportation and subway

options. (Id. 202:20-22.)  The LMZ contains only three first-run theatres for top commercial

films: the Union Square 14, the Loews Village VII, and the Village East. (See Araujo Dep. 16-

17, 102-103; Smerling Dep. 82.)  While numerous other movie theatres exist in the LMZ, such as

The Angelika—also owned by Citadel Cinemas—and the Landmark Sunshine Theatre, also

exhibit first run movies, they are "art" or specialized films, i.e., independent and foreign-

language films.[6]  Plaintiffs conceded that a number of first-run theatres for top commercial films

are located immediately outside the LMZ, however, including Loews 19th Street, the Clearview

Chelsea, located at 23rd Street between Seventh and Eighth Avenues, Loews Kips Bay, located

at Second Avenue and 32nd Street, Loews 34th Street and AMC Empire and Loews 42nd Street

E-Walk Theatre, as well as the Regal Battery Park Stadium, located in Battery Park City. (Def.'s

Mem. Law Supp. Summ. J. 15 & 20; Def.'s 56.1 Statement ¶ 46; Pls.' 56.1 Statement Resp. No.

---

[5] While Plaintiffs call this zone the "Lower Manhattan Zone," industry professionals refer to this zone as the "Village Zone." (See Keeley Aff., 107.)

[6] A current listing in a local newspaper shows the following movies at the Angelika and Landmark Sunshine Theatres:  "The Story of a Murderer," "Notes on a Scandal," "The Painted Veil," "The Good German," "The Queen," "Pan's Labyrinth," "Letters from Iwo Jima" and "Volver."  At the Village East, the following movies are playing: "Children of Men," "Dreamgirls," "Apocalypto," "Borat," and "Little Children."

46.)

        D. The Product Market for "Top Commercial Films"

        According to Plaintiffs, not all motion pictures are alike, and not all motion pictures compete with one another. "Art" films and foreign films, for example, are asserted not to be interchangeable with top-grossing commercial films. (See Guadagno Dep. 35; Lewellen Dep. 143-45; Polon Dep. 109-10.) In order to determine the proper release strategy, distributors attempt to predict, through screenings, industry publications and tracking services, which films will generate the highest box-office returns. (See Engel Dep. 22; Campbell Dep. 90; Pade Dep. 59-60; Smerling Dep. 147-48.) A number of factors affect the expected gross of a movie, including the reputation of the director, the number of well-known actors in the film, the size of the production and advertising budgets, and whether the movie is a sequel to a previous movie.[7] (See Engel Dep. 21.) Plaintiffs assert that films expected to gross more than $75 million in domestic box-office receipts, which Plaintiffs term "Top Commercial Films" or "TCFs", are a separate product market for which no other films are an adequate substitute. (Pls.' Mem. Law Opp'n Summ. J. 8.) Regal submits that the predictions of a $75 million gross, are more frequently wrong than correct, as few films achieve the $75 million target. (Def. Mem. In Supp. 43.)

---

    [7] Even a cursory review of the films now running at "art" theatres, see supra note 6, suggests that these factors are not useful in defining a top commercial film. For example, "The Good German" stars George Clooney; Helen Mirra appears in "The Queen," Clint Eastwood is the Director of "Letters from Iwo Jima," which is itself a sequel to (or the other side of the coin of) "Flags of our Fathers." Dame Judi Dench and Kate Blanchett perform in "Notes on a Scandal." Plaintiffs proposed explanation on why these first-run, very popular movies should be kept in a separate product market from top commercial films, such as "Dreamgirls" or "Borat," which features fractured English, without subtitles, is not satisfactory. It is not immediately apparent why these (or their equivalents during the period in suit) are or should be in a separate product market. What is "art" to one person may well be "commercial" to another. In the last analysis, the goal of movies in whatever category is to make money.

E. Film Exhibition in the Lower Manhattan Zone Since the late 1990s

Prior to November 1998, the Loews Village VII and the Village East were the two largest theatres in the LMZ, and TCF's were distributed relatively evenly between the two theatres.[8] (Keeley Aff., Ex. 10 (Tollison Report ¶ 118).)  In November 1998, however, the Union Square 14 opened its doors. (Smerling Dep. 17.)  The new theatre had fourteen screens (more than any theatre in Manhattan at the time), had stadium seating in all its auditoriums, and had 3134 seats.[9]  As a result of its size and amenities, the Union Square 14 quickly became one of the largest grossing theatres in Manhattan. (See Palansky Aff., Ex. 1 (Rubinfeld Report ¶ 23); Keeley Aff., Ex. 52.)  One movie distributor executive described the opening of the Union Square 14 as a "sea change," because for the first time there was "a theatre in that area that on a picture that normally would not do great business in Manhattan, did unprecedented business—two, three four times anything [the distributors] ever would have gotten . . . out of this area before." (Blake Dep. 64.)  Another distributor described the Union Square 14 as "one of those rare theatres that makes [films] look important." (Bruer Dep. 59-60.) In fact, even one of Plaintiffs' own executives admitted that the Union Square 14 was "probably the best theatre in

---

[8] Despite the fact that both the Village East and the Loews Village VII have seven auditoriums, and both had access to top-grossing commercial films, the Village East consistently grossed less than the Village VII. (See Keeley Aff., Ex. 118.)  This is likely due to the fact that the Village East's auditoriums are smaller, and therefore can accommodate less patrons during each showing of a movie. (See Palansky Aff., Ex. 38, at 2.)

[9] By contrast, the Village East only has stadium seating in two of its seven auditoriums.  Most moviegoers prefer stadium seating, and therefore consider this factor when deciding where to see a movie. While Plaintiffs now argue that stadium seating is not as important to consumer choice as Regal maintains, in 2000 Plaintiff Citadel Cinemas admitted: "[M]any of the Company's cinemas are older, and do not feature state of the art seating.  [As a result, Citadel Cinemas] has found it difficult to compete with state of the art multiplex and megaplex cinemas. . . ." (Palansky Dep., Ex. 55, at 4.)

Manhattan."[10] (Palansky Aff., Ex. 43.)  By contrast, the Vice Chairman of Sony Pictures

described the Village East as an older, less desirable theatre:

> [The Village East has] four really horrible theatres in the basement
> . . .  Very old fashioned design of a theatre that you don't even see
> much anymore, where–you know, dividing up a larger screen to
> the point where what used to be the back of the theatre is now the
> front of the theatre.  And you open the door, and here's the
> audience looking at you because the door is right next to the screen
> and they're very small auditoriums. . . .  And, you know, it's really
> cramped seating, cramped conditions, frankly something that, if we
> played a film in, and one of the people connected with the film
> were to attend or a friend of someone connected with a film would
> attend, my phone would ring, and it would not be complimentary.[11]

(Blake Dep. 107-08.)  As a result, the Union Square 14 quickly became the theatre of choice for

film distributors.

Prior to the opening of the Union Square 14, the Village East made clear that it

did not want to play day and date with the new theatre. (See Smerling Dep. 83.)  As a result,

distributors licensed films to the Union Square 14.  When the Village East realized that its was

no longer getting the movies it desired, it approached distributors and expressed a willingness to

play day and date with the Union Square 14, but distributors continued to play a number of top-

grossing films only at the Union Square 14. (See Pls.' Mem. Law Opp'n 14.)

In addition, at least five other theatres, all with stadium seating, opened in

---

[10] While Plaintiffs' executive did not identify the Union Square 14 in this statement, given that
the Union Square 14 was United Artist's newest, largest, and most up-to-date theatre, it is most likely that
he was talking about the Union Square 14 theatre.

[11] While the Village Voice, a local newspaper, described the Village East as a beautiful
theatre—"one of a handful of theaters in New York that isn't completely sterile"—it noted that the theat's
facilities are inadequate. See www.villagevoice.com/nycguide/ve5218,5.html.  Specifically, the paper
stated that most of the Village East's auditoriums have "ludicrously small screens" and that the "Carnegie
Hall-style steepness [of the main auditorium] ensures that absolutely no seat has comfortable sightlines."
Id.

Manhattan since 1998.  The Loews Kips Bay, for example, is within easy walking distance and Regal Battery Park is located in lower Manhattan. (See Regal.'s Local Rule 56.1 Statement ¶ 42.)  As a result of this new competition, the Village East's revenues steadily declined after 1998.  Much of this business was lost to the Union Square 14.  In 2002, the Union Square 14 got approximately seventy-one percent of all film revenue generated in the LMZ; the Village East got less than eleven percent. (Am. Compl. ¶ 54.)  This new competition has not ruined the Plaintiffs completely,[12] however, and the Village East remains in operation as a first-run theatre.

F. Regal's Behavior in the Marketplace

Plaintiffs contend that Regal uses its success in the Manhattan market—and nationwide, more generally—as leverage, often bullying distributors into less than desirable film rent deals. (See Keeley Aff., Exs. 46-47, 109-12, 129.)  In fact, Kurt Hall, co-CEO of Regal admits that Regal "fights" with distributors "every single day." (Hall Dep. 217.)  Regal's disputes with DreamWorks got so bad that DreamWorks threatened not to license films to Regal in the future. (See Keeley Aff., Exs. 46, 129.)  In that letter, Disney refers to an inappropriate "all or nothing" licensing deal that Regal has proposed during licensing negotiations. (See id., Ex. 46.)  On another occasion, Michael Pade, a United Artists Executive, launched a tirade of offensive comments at a Twentieth Century Fox ("Fox") representative after Fox licensed a high-grossing film to the Village East instead of the Union Square 14.  In his letter, Mr. Pade made his distaste for the Village East clear: "Don't you think it's time to divest yourself of your Village East stock?  This is getting embarrassing. . . . [M]aybe we can work something out." (Keeley Aff., Ex.

---

[12] Regal's Senior Vice President of Film explained that when new multiplex theatres open in a neighborhood, older theatres often go out of business. (See Cooper Dep. 233:5-10.)  In fact, according to Regal executives, Regal has closed approximately 1800 older, sloped floor screens because they were not able to compete after multiplex theatres opened nearby. (See id. 233:11-22; Campbell Dep. 154:16-23.)

49.)  In another letter to Fox, Mr. Pade likened the Village East to "a cave in Tora Bora." (Id., Ex. 51.)

Plaintiffs now sue Regal under Section 1 of the Sherman Act, alleging that the Village East's steadily declining profits is the result of a series of illegal licensing agreements between Regal and its distributors.  Defendants contend that Plaintiffs' declining profits are the result of the Village East's inability to compete in the changing movie theatre marketplace.  On this basis, Regal moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

## DISCUSSION

### I. STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted only where "there is no genuine issue of material fact," so the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  If the moving party establishes the absence of a genuine issue of material fact, "a limited burden of production shifts to the nonmovant, who must 'demonstrate more than some metaphysical doubt as to the material facts.'" Id. (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  If the nonmoving party fails to establish a genuine issue of material fact, summary judgment must be granted. Id.

In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (2002); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133,

11

142 (2d Cir. 2004).  A material fact is disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.  Consequently, summary judgment on an issue of fact is not appropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party." <u>Lucente</u>, 310 F.3d at 254.  Nevertheless, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." <u>Niagara Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003) (quoting <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998)).  An antitrust plaintiff cannot withstand summary judgment merely by offering "conclusory allegations which merely recite the litany of antitrust," <u>Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc.</u>, 936 F. Supp. 130, 135 (S.D.N.Y. 1996) (quoting <u>John's Insulation, Inc. v. Siska Constr. Co.</u>, 774 F. Supp. 156, 163 (S.D.N.Y. 1991)), but must come forward with "'*specific facts* showing that there is a genuine issue for trial.'" <u>Powell</u>, 364 F.3d at 84 (quoting <u>Aslanidis</u>, 7 F.3d at 1072) (emphasis added).  "In the context of antitrust cases . . . summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 104 (2d Cir. 2002).

## II. SHERMAN ACT CLAIMS

The factual support for Plaintiffs' theory of Sherman Act Section 1 liability is difficult to pin down.  Plaintiffs argue that because they do not get as many first-run top commercial films, there must be a conspiracy.  Proof of the alleged conspiracy is based on a mélange of allegations, but after two years of extensive discovery, Plaintiffs' surmise is not sufficient to withstand a motion for summary judgment.

Plaintiffs allege that Regal has used its ownership of theatres in sole exhibitor

zones to "exercise monopoly leverage" in competitive zones, like the LMZ.  Plaintiffs explain: "Both Regal and Loews (Loews settled with Plaintiffs) unabashedly have used their control of thousands of exhibit screens throughout the United States─most of which face little or no direct competition─to coerce agreements from the major distributors of TCFs . . . not to license TCFs to the [Village East]." (Pls.' Mem. Law Opp'n 1.)  Plaintiffs depict the relationship between Regal and its distributors as inherently coercive, so that distributors "have little choice but to acquiesce to the demand of Regal . . . that they license Top Commercial Films exclusively to Regal . . . in the Lower Manhattan Zone." (Am. Compl. ¶ 7.)  But these allegations most accurately assert a claim for attempted monopolization, which is cognizable under Section 2 of the Sherman Act, not Section 1.  Plaintiffs sue Regal only under Section 1 of the Sherman Act, which prohibits "[e]very contract, combination . . . or conspiracy in restraint of trade." 15 U.S.C. § 1.  To make out a claim under Section 1, Plaintiffs must show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint on trade either per se or under the rule of reason." Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 263 (2d Cir. 2001) (quoting Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95-96 (2d Cir. 1998)). Thus, under Section 1 it is irrelevant if Regal acted like a bully, as long as it did so independently.  In the absence of proof that Regal agreed with at least one other entity to restrain trade, Plaintiffs cannot prevail under Section 1 of the Sherman Act.

   A. Circuit dealing

            In order to fit these allegations into the rubric of Section 1, Plaintiffs allege that Regal's monopolistic conduct has resulted in unlawful exclusive agreements and unreasonably

broad day and date clearance agreements between Regal and its distributors.  Without identifying

precisely the substance of these agreements, Plaintiffs suggest that these agreements violate

Section 1 because they have the effect of ensuring that the Village East cannot obtain a license

for top commercial films.  In its opposition papers, Plaintiffs suggest, without even using the

term "circuit dealing," that the agreements between Regal and its distributors amount to circuit

deals, in the sense that Regal has tied licensing in sole exhibitor zones to exclusive licenses in

competitive zones, particularly the LMZ.[13]  But, as with Defendants' motion to dismiss,

"Plaintiffs raise the allegation of circuit dealing for the first time in their opposition papers,

having nowhere alleged in the complaint that defendants negotiated contracts with distributors at

a circuit-wide level." Reading, 317 F. Supp.2d at 318.  On Defendants' motion to dismiss, Judge

Lynch made clear that "[t]he complaint not only fails to allege facts sufficient to support the

allegation of circuit dealing, it also fails to assert even the components of such a theory.  It

therefore fails to meet the requirement under Federal Rule of Civil Procedure 8 that plaintiff's

claim include '[a] statement of a claim for relief that gives notice to the opposing party.'" Id.

While Plaintiffs had the opportunity to amend their complaint after Judge Lynch's decision,

Plaintiffs' amended complaint, which was submitted to the Court on December 24, 2003, asserts

exactly the same allegations as the original complaint; Plaintiffs did not add additional facts that

would suggest a claim of circuit dealing.  Plaintiffs' failure to amend its complaint to adequately

---

[13] Judge Lynch explained that "[c]ircuit deals are agreements whereby exhibitors use their monopoly power (or near monopoly power) in one or more areas to negotiate blanket exclusive agreements with distributors covering all of their theatres, including areas where they may have competition." Reading, 317 F. Supp. 2d at 318; see also United States v. Griffith, 334 U.S. 100, 107-09 (1948) (discussing circuit dealing and declaring such conduct in restraint of trade), rev'd on other grounds, Beech Cinema, Inc. v. Twentieth Century-Fox Film Corp., 622 F.2d 1106, 1109-10 (2d Cir. 1980) (holding that sufficient evidence exists to sustain finding of circuit dealing between film distributor and theatre chain in violation of the Sherman Act).

14

plead a claim for circuit dealing sent a distinct signal to the defendants that Plaintiffs did not believe circuit dealing was taking place.  As Judge Lynch made clear, Plaintiffs cannot add this claim for the first time in their opposition papers.  See id.  Thus, the Court will not construe Plaintiffs' allegations against Regal as a claim for circuit dealing.

Even if the Court liberally construed Plaintiffs' complaint to include a claim for circuit dealing, Plaintiffs would not prevail.  Plaintiffs are correct that circuit dealing is per se anticompetitive.  See United States v. Paramount Pictures, Inc., 334 U.S. 131, 154-55 (1948); United States v. Griffith, 334 U.S. 100, 107-08 (1948) (discussing circuit dealing as a violation of Section 2 of the Sherman Act), rev'd on other grounds, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771-72 (1984);  Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 116-18 (1948) (discussing circuit dealing as concerted action under Section 1 of the Sherman Act); accord Beech Cinema, Inc. v. Twentieth Century-Fox Film Corp., 622 F.2d 1106, 1107-09 (2d Cir. 1980).  As the Court explained in Paramount:

> In the first place, they eliminate the possibility of bidding for films theatre by theatre.  In that way they eliminate the opportunity for the small competitor to obtain the choice runs, and put a premium on the size of the circuit.  They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators.  In the second place, the pooling of the purchasing power of an entire circuit in bidding for films is a misuse of monopoly power insofar as it combines the theatres in closed towns with competitive situations.

Paramount, 334 U.S. at 154-55.  Thus, had Plaintiffs presented sufficient evidence for a reasonable jury to find that Regal and its distributors conspired to enter into circuit deals, Regal's conduct would be unlawful.  Despite submitting over two hundred exhibits to this Court, Plaintiffs have failed to do so.

Even when construing all facts in the light most favorable to Plaintiffs, no

15

reasonable jury could find a conspiracy between Regal and its distributors.  Not surprisingly, Plaintiffs have no direct evidence of such a conspiracy between Regal and its distributors.  It is correct that antitrust plaintiffs may (and often must) prove conspiracies by "circumstantial evidence and the reasonable inferences drawn from such evidence," rather than through direct evidence. Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1230 (3d Cir. 1993); accord Venture Tech., Inc. v. Natural Fuel Gas Co., 685 F.2d 41, 45 (2d Cir. 1982).  But, to survive a motion for summary judgment on a Section 1 claim, an antitrust plaintiff must present evidence that "'tends to exclude the possibility' that the alleged conspirators acted independently." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986) (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)); accord VKK Corp. v. NFL, 244 F.3d 114, 131 (2d Cir. 2001).  Furthermore, "[i]n the context of antitrust litigation the range of inferences that may be drawn from ambiguous evidence is limited; the non-moving party must set forth facts that tend to preclude an inference of permissible conduct." Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993). Plaintiffs insist that their evidence, in the aggregate, "tends to exclude" the possibility that the distributors' decisions not to license certain films to the Village East were made independently. Considering all of Plaintiffs' exhibits in the aggregate, the Court does not agree.

To support its allegations of tacit collusion, Plaintiffs point to the following evidence: (1) an October 5, 1998 letter from Regal's Senior Vice President to Disney's President of Distribution expressing that Regal considers its "overall national relationship [with Disney] more important than any single location"; (2) a letter from DreamWorks suggesting that Regal made an "all or nothing" offer to Dreamworks to license a particular film; and (3) two letters

16

from a Regal/United Artists representative using foul language towards a Fox representation, in the course of which the representation refers to the Village East in a derogatory manner. (Pls.' Mem. Law Opp'n 43-44; Keeley Aff., Exs. 46, 47, 115, 116.)

Reading these letters in their entirety, however, these documents do not permit the inferences that Plaintiffs suggest.  First, Regal's letter to Disney complains about the fact that Disney refused to let the Regal North Bergen play day and date with the Loews theatre in Secaucus, only three miles away. (Keeley Aff., Ex. 46.)  Thus, if anything, this letter suggests that Disney was not giving Regal favorable treatment.  How this letter proves that Disney conspired with Regal, entering unlawful exclusive licensing agreements in the LMZ is beyond the imagination of this Court.  Such an inference would be inappropriate and unreasonable.  The mere fact that Regal refers to an "overall national relationship" with Disney proves nothing.  Despite Plaintiffs' urgings to the contrary (see Pls.' Mem. Law Opp'n 43), Paramount did not condemn the existence of national relationships between theatres and distributors, as such relationships are inevitable; Paramount merely condemned using these national relationships to leverage master licensing agreements nationwide. See Paramount, 334 U.S. at 154-55; Schine Chain Theatres, 334 U.S. at 116.

Similarly, the letter from DreamWorks to Regal's Chief Executive Officer does not support an inference of concerted action.  In the letter, DreamWorks expressly states:

> Regal's submission of a global "take it or leave it" percentage for the circuit effectively ended good faith negotiations between our companies.
> . . . Regal's counteroffer required DreamWorks to book all of Regal's theatres or none at all at one set of terms for competitive theatres, and at another for non-competitive theatres.  Regal's insistence on booking its circuit in this way is not in accord with DreamWorks' police of booking its pictures theatre-by-theatre,

and, we believe, violates basic tenets of law.

(Keeley Aff., Ex. 46.)  Like the Regal-Disney letter, this letter actually undermines Plaintiffs'

claim that a conspiracy existed between Regal and its distributors.  DreamWorks's harsh

criticism of Regal's attempt to book the entire circuit makes clear that DreamWorks was not

willing to bend to Regal's requests.  This suggests a lack of concerted action, not a tendency

towards it.  Plaintiffs also suggest that a reasonable jury could find from this letter that illegal

circuit deals existed with other distributors.  Its logic appears to be that, if Regal offered a circuit

deal to DreamWorks, it likely offered similar deals to other distributors.  While DreamWorks did

not accept such a deal, other distributors may have.  In the absence of other evidence that Regal

offered, and other distributors accepted, "all or nothing" circuit deals like the one posed to

DreamWorks, such an inference, while possible, would be unreasonable.

Finally, the two letters from Michael Pade, Executive Vice President to Fox,

while offensive, do not "tend to disprove" independent action.  In the first letter, date December

3, 2001, Mr. Pade pokes fun at the fact that Fox licensed the film Behind Enemy Lines to the

Village East. (Keeley Aff., Ex. 49.)  Like the Disney and DreamWorks letters, this letter

expressly undermines any finding that distributors conspired with Regal to push the Village East

out of the marketplace.  After all, the letter stands as affirmative proof that, as of December

2001, Fox was licensing movies to the Village East, the very thing that Plaintiffs allege the

distributors have conspired with Regal not to do.  The second letter from Mr. Pade to Fox, dated

December 4, 2001, says absolutely nothing at all relevant to this litigation.  Mr. Pade simply

launches a tirade of rude, profane and derogatory comments at the Fox representative, in the

course of which he likens the Village East to "a cave." (Keeley Aff., Ex. 51.)  He says nothing

about circuit deals or any other licensing agreements. (Id.)  Thus, while a jury might infer from

this letter that doing business with United Artists could be unpleasant, Mr. Pade's comments do

not support an inference that Regal conspired with Fox to license on a circuit-wide basis.

Plaintiffs also suggest that the distributors' outright refusal to even consider

licensing top commercial films to the Village East is evidence from which a jury could find tacit

collusion.  In support, Plaintiffs submit a series of letters between the Village East and certain

distributors in which the distributors expressly rejected Plaintiffs' requests to bid for films.

(Keeley Aff., Exs. 182-99.)   This argument is baseless and completely misrepresents the

substance of the communications between the Village East and the allegedly conspiring

distribution companies.  Each of the Village East's letters is the same: Village East requests the

opportunity to bid, on an exclusive or non-exclusive basis, for first-run films to be released after

December 1, 2002. (Id.)  In their responses, the distributor companies make clear that they have

no interest in instituting bidding in the Manhattan film market.  Thus, the distributors were not

rejecting the possibility of licensing to the Village East; instead, they were rejecting the Village

East's suggestion that exhibitors bid for movies.  As the Executive Vice President for New Line

Cinema explained in his response: "I am sorry we cannot grant your request to bid as New Line

licenses its films by determining in its unilateral business judgment the theatre or theatres in a

given market that it believes is best for that particular movie." (Keeley Aff., Ex. 195.)  The

representatives for Warner Bros. Pictures, Miramax Films Sony Pictures, Sony Pictures and

Buena Vista Pictures all had similar responses: none of these companies was interested in

selecting its licenses through a bidding process, but would continue to consider the Village East

for licenses in the future. (Id., Ex. 196-99.)  No reasonable jury could find from the mere fact

that distributors were unwilling to commence bidding with the Village East that the distributors

conspired with Regal.  In Paramount, the Supreme Court made clear that bidding is not required

19

to ensure a competitive market. See 334 U.S. at 161-66.  Instead, to protect against anticompetitive licensing, distributors must make their licensing decisions theatre-by-theatre, on the merits.  See id.  Thus, as long as distributors exercise independent judgment in deciding not to license to the Village East, they have absolutely no duty under the law to commence a competitive bidding process, and their failure to do so cannot be used against them to establish a Section 1 violation.

        Lastly, Plaintiffs suggest that a reasonable jury could infer from the mere fact that distributors "rarely licensed TCFs to the [Village East] between 1999 and 2004" that Regal had succeeded in negotiating illegal licenses with its distributors.  The problem with this suggestion is that it assumes that distributors would not decide, in their independent business judgment, to license these top-grossing films to a theatre other than the Village East.  This assumption is belied by the record.  According to Plaintiffs' own evidence, long before the alleged "conspiracy" between Regal and its distributors, the Village East was a relatively low-grossing theatre.  In a 1995 report of box office revenues for seven Manhattan movie theatres, the Village East was one of the bottom two theatres as far as revenue. (Keeley Aff., Ex. 107.)  Another report listing 1994-1998 gross revenues of theatres in the LMZ shows that the Village East always underperformed in relation to the Village VII Theatre. (Id., Ex. 118.)  Thus, once the Union Square opened in November 1998, the Village East became the lowest performing of the three first-run movie theatres in the zone.  Furthermore, it is undisputed that the Union Square 14 has more screens and more seats than the Village East, has stadium seating in all its theatres (which the Village East does not), and is closer to a subway station than the Village East theatre.  These are factors that could increase the number of patrons, and therefore the number of tickets sold, at a particular theatre.  Given that distributors' revenues are directly linked to an exhibitor's profits on the

movie, it is economically reasonable for distributors to license movies to theaters with the most earning potential.  Further, because the split between the distributor and the exhibitor is determined after subtracting out a house allowance, exhibiting the same movie day and date will often not be in the distributors' best interest.  Therefore, despite Plaintiffs' conclusory suggestions to the contrary, the mere fact that most of the top-grossing films have gone to Regal and Loews, rather than the Village East, does not "tend to disprove" independent action.

In sum, in all of Plaintiffs 202 exhibits in support of its position, the Court cannot find any evidence from which a reasonable jury could find that Regal coerced distributors into illegal circuit deals with its distributors.  At most, Plaintiffs' evidence suggests that Regal bullied its distributors and, at times, attempted to pressure them into more favorable deals.  There is absolutely no evidence, however, that its tactics worked.  In the absence of evidence that, at the very least, tends to disprove independent action by the distributors, a Section 1 claim for circuit dealing cannot lie.

B. Exclusive Licenses

What the Court is left with are allegations that Regal entered into exclusive deals with its distributors.  It is a well-settled tenet of antitrust law that exclusive agreements between firms at different levels of the distribution chain are not per se anticompetitive, and therefore these agreements must be analyzed under the rule of reason. See, e.g., Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 735 (1988).  "The principal question in a rule of reason case is often whether the anticompetitive effects of a restraint are outweighed by some procompetitive justification." See United States v. Visa, U.S.A., Inc., 344 F.3d 229, 238 (2d Cir. 2003).  The Second Circuit has applied a complex three-part burden-shifting test to determine the reasonableness of an agreement under the rule of reason:

> As an initial matter, the [plaintiff] must demonstrate that within the relevant market, the defendants' actions have had substantial adverse effects on competition, such as increases in price, or decreases in output or quality. Once that initial burden is met, the burden of production shifts to the defendants, who must provide a procompetitive justification for the challenged restraint. If the defendants do so, the [plaintiff] must prove either that the challenged restraint is not reasonably necessary to achieve defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition.

Visa, 344 F.3d at 238 (internal citations omitted).

Plaintiffs' initial burden actually has two parts. Plaintiffs must first establish proper product and geographic markets and show that the alleged conspirators have market power in the relevant market. Then, Plaintiffs must demonstrate that it suffered antitrust injury in the relevant market. Plaintiffs fail to establish either of these two parts.

*1. Market Definition and Regal's Market Power in the Relevant Markets*

Plaintiffs define the relevant product market as the market for "Top Commercial Films," or "TCFs." Plaintiffs define TCFs as "pictures expected to gross at least $75 million in domestic theatrical box office receipts." (Pls.' Mem. Law Opp'n 8.) Regal argues that this product market is flawed because distributors cannot accurately predict which movies will gross $75 million prior to releasing the film. Regal also argues that TCFs are not a valid product market because there is no evidence that consumers regard only other TCFs, and not other films, to be substitutes for TCFs. The determination of what constitutes a relevant market is "a deeply fact-intensive inquiry," N.Y. Jets LLC v. Cablevision Sys. Corp., No. 05 Civ. 2875 (HB), 2005 WL 2649330, at *5 (S.D.N.Y. Oct. 17, 2005) (internal quotation marks omitted). Plaintiffs have submitted little evidence that art, foreign, and small-budget films are not a good substitute for TCFs—which contain famous actors and directors and large production budgets—in the minds of

many consumers.  Indeed, as previously indicated, many films that are exhibited at "art" or "speciality" theatres are extraordinarily popular in Manhattan.  Further, they bear all the supposed indicia of top commercial films, including top actors and actresses, top directors, and large advertising promotions.  The Court is very dubious that TCFs are anything other than the films which Plaintiffs want, but that does not place such films in a separate product market.  The Court need not decide this issue, however, in light of its determination concerning the geographic market.

For antitrust purposes, a relevant geographic market is the "'area of effective competition in which the seller [here, Regal] operates, and to which the purchaser [here, moviegoers] can practically turn for supplies.'" United States v. Eastman Kodak, 63 F.3d 95, 104 (2d Cir. 1995) (quoting Tampa Elec. Co. v. Nashville Coal. Co., 365 U.S. 320, 327 (1961)). In essence, if the purchaser, i.e., the moviegoer, can go beyond the defined market for supplies, i.e., movies, then the geographic market is too narrowly defined.[14]  Plaintiffs' define the LMZ as "the area from river to river, south of 18th Street, excluding Battery Park City." (Am. Compl. ¶ 16.)  Defendants correctly point out that one quick glance at "a map of Manhattan is all that is necessary to illustrate how untenable Plaintiffs' proposed geographic market is." (Def.'s Mem. Law Supp. Summ. J. 30-31.)  There is no legitimate factual support for the Plaintiffs' proposed geographic market—the LMZ.  Plaintiffs' geographic market excludes seven theatres located within 1.7 miles of the LMZ, including the Loews 19th Street, which is literally across the street from the LMZ.   The Court cannot fathom why New York moviegoers cannot go beyond the LMZ for first-run movies, when seven additional theatres are located within 1.7 miles of the

---

[14] This test is often referred to as "cross-elasticity of demand." See, e.g., Hayden Pub'g Co. v. Cox Broad. Corp., 730 F.2d 64, 71 (2d Cir. 1984).

LMZ and one is across the street from the LMZ.  Unless there is a properly defined geographic market, there is no way to measure Regal's market power.  As it stands now, if Regal raised its prices, moviegoers could easily go elsewhere to see a movie.  Thus, Regal has no market power.

Plaintiffs' evidence to the contrary is unconvincing.  First, Plaintiffs point to the fact that industry professionals consider the LMZ a separate zone for licensing purposes.  This has little relevance in the antitrust context.  For antitrust purposes, the proper inquiry is how consumers, not suppliers, view the market.  There is absolutely no evidence that moviegoers view "the area from river to river, south of 18th Street, excluding Battery Park City" as a separate market, so that if Regal raised prices as the Union Square 14, they would not venture outside of the LMZ to see a movie.

Second, Plaintiffs point to the empirical data of their expert, Dr. Robert Tollison, the former Director of the Federal Trade Commission Bureau of Economics.  Dr. Tollison performed regression analyses of the consequences of Union Square 14 raising its prices twenty-five cents on several occasions, on the attendance at the Clearview Chelsea movie theatre on 23rd Street between 7th and 8th Avenue.  Dr. Tollison found no impact, and Plaintiffs trumpet this finding as an absence of cross-elasticity of demand between the Union Square 14 and the Clearview Chelsea.  Plaintiffs conclude from this that the LMZ is a separate market.  This conclusion is spurious.  It ignores too many factors which impact a moviegoer's decision of where to see a particular movie, including what other movies are playing at the particular theatre, the cleanliness of the theatre, the seating structure and capacity of the theatre, and the theatre's proximity to the nearest subway station.  Further, it ignores the numerous other theatres within a short walking distance from the LMZ.  The de minimis increase in movie prices may very well

send moviegoers to other theatres outside the LMZ.[15]   Dr. Tollison's report is too sketchy and

underinclusive; nor do his regression analyses explain why Loews 19 and Union Square 14 are in

separate geographic markets, when the two theatres are literally at opposite ends of the very

same 4, 5, 6 and Q, W, N, R, subway platforms.

           Next, Plaintiffs argue that because the cost of a taxicab or subway ride is higher

than the average increase in the price of a movie ticket, "only theatres within easy walking

distance of each other in Manhattan can be considered competitive." (Pls.' Mem. Opp'n 36.)

This assertion defies logic for a number of reasons.  First, Plaintiffs themselves admit that the

LMZ, particularly Union Square, is a destination location.  This means that many of the people

who come to the LMZ to see movies have already taken a subway or taxicab to get there.

Further, many residents who live within the LMZ already have to take a subway, bus or taxicab

to get the movie theatres within the LMZ.  Were the Union Square 14 to raise prices above

market level, these individuals would simply get off the subway at 23rd Street, or 34th Street, or

42nd Street, rather than 14th Street.  Furthermore, even if the moviegoer did disembark at Union

Square, numerous theatres are within easy walking distance of the LMZ.  Thus, even if Plaintiffs

are correct that only theatres within easy walking distance of each other in Manhattan are

competitive, the LMZ is still too thin a slice to constitute a legitimate geographic

---

    [15] In fact, one document containing box office market share for 2002 lists Clearview Chelsea as
grossing less than City Cinemas, suggesting perhaps that Clearview Chelsea also contains older, less
desirable theatres in Manhattan. (See Keeley Aff., Ex. 54.)  In light of this, there is no reason to believe
that the Union Square 14 and the Clearview Chelsea are comparable theatres, so that an increase in ticket
prices at the former would drive customers to the latter.

market.[16]

In sum, the LMZ, as defined by Plaintiffs, is not a valid geographic market for purposes of this antitrust inquiry. No reasonable jury could find that the three movie theatres in the LMZ do not compete with the numerous movie theatres within walking distance of the LMZ. Similarly, no reasonable jury could find that, if Regal raised its prices to an above market level, customers would not venture outside of the LMZ to see their movies. This suggests that Regal does not have "the power to 'force a purchaser to do something that he would not do in a competitive market.'" Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 464 (1992) (quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 14 (1984)). Without market power in the relevant market, the exclusive agreements between Regal and its distributors are not unreasonable.

### 2. Antitrust Injury

To prevail on their claim, Plaintiffs must demonstrate that they suffered antitrust injury in the relevant market. Plaintiffs have failed to define the relevant geographic market and it is not at all clear that TCFs are an appropriate product market. But even assuming a properly defined geographic and product market, Plaintiffs still have failed to demonstrate antitrust injury. "Antitrust injury" refers to "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir. 1994). This requirement stems from the fundamental precept that "the antitrust laws . . . were enacted

---

[16] Plaintiffs' theory ignores, for example, that many New Yorkers already have monthly passes providing unlimited rides on the subway system. Thus, for many New Yorkers, shifting from a theatre in the LMZ to a theatre outside of the LMZ does not add additional costs.

for 'the protection of competition, not competitors.'" <u>Brunswick Corp.</u>, 429 U.S. at 488.

Plaintiffs can recover under the antitrust laws only if defendants' conduct is "competition-

reducing." <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 343-44 (1990).  The

challenged agreement can be unreasonable only if it "has had an actual adverse effect on

competition as a whole in the relevant market," not just on the Village East as a competitor.

<u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 543 (2d Cir.

1993), <u>cert. denied</u>, 510 U.S. 947 (1993).

   In an attempt to establish antitrust injury, Plaintiffs allege the following harms to

competition: an increase in ticket and concession prices; a decline in the overall quality of the

moviegoing experience, and; an inability by moviegoers to see movies in the theatre and at the

time of their choice.  But a true antitrust injury would be a diminution in the overall availability

of films, and higher admission prices.  There is no evidence of a reduction of the number of

movies, nor is there any evidence that Union Square 14 charges supra market prices.  The alleged

high price of popcorn is not an antitrust concern.  The assertion that rats attend the Union Square

14, eating the moviegoer's popcorn, is surely a fable. (<u>See</u> Pls.' Mem. Law Opp'n, fn 65.)

Besides, it would be a matter for the City Department of Health, not the Sherman Act. As Judge

Loretta Preska of this District explained in <u>Six West Retail Acquisition</u>, another movie theatre

case:

> Though true that a reduction in quality can constitute a harm to
> consumers, the mere possibility that a consumer might have to see
> his or her first choice movie at his or her second choice theatre or
> his or her second choice movie at his or her first choice theatre . . .
> is not an actionable restraint on trade.  Every licensing agreement
> between an exhibitor and distributor will restrain trade to some
> extent, as licensing agreements necessarily entail that a film is

> shown at one theatre and not another.  But the mere fact that a
> consumer might, for example, prefer to watch a film at [one
> theatre] has to instead go to another nearby theatre to see that film
> does not mean that there has been an actionable harm to consumer
> choice or competition.

Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499, 2004 WL

691680, at *10 (S.D.N.Y. Mar. 31, 2004), aff'd, 124 Fed. Appx. 73 (2d Cir. 2005).  It is a fact of

life that movie admission prices have increased over time, but there is absolutely no evidence

that these increases are connected to the exclusive agreements between Regal and its distributors.

Therefore, Plaintiffs fail to establish any injury to the marketplace itself.  Injury to the Village

East is not sufficient.  Accordingly, Plaintiffs' claim against Regal for illegal exclusive licensing

agreements with its distributors in violation of Section 1 of the Sherman Act fails as a matter of

law.

C. Clearance Agreements

Plaintiffs also allege that Regal has entered into unlawful clearance agreements

with its distributors. (Am. Compl. ¶ 85.)  Clearance agreements[17] are commonly used in the film

exhibition industry, as they ensure that a particular theatre's income from a film will not be

greatly diminished because the film is also being shown at a nearby competing theatre. See

Paramount, 334 U.S. at 145.  Recognizing the procompetitive benefits of clearance agreements,

the Supreme Court has long held that such agreements are reasonable as long as they are "not

---

[17] As explained in the background section above, a clearance agreement is an agreement between
a theatre and a distributor that a particular film will not be played simultaneously for a particular period of
time at two different theatres in the same zone.  The Supreme Court explained in Paramount that "[a]
clearance is the period of time, usually stipulated in license agreements, which must elapse between runs
of the same feature within a particular area or in specified theatres." 334 U.S. at 145 n. 6.

unduly extended as to area or duration." Id.  In determining whether a particular clearance

agreement is reasonable, a court should consider the following factors:

> (1) The admission prices of the theatres involved, as set by the
> exhibitors;
> (2) The character and location of the theatres involved, including
> size, type of entertainment, appointments, transit facilities, etc.;
> (3) The policy of operation of the theatres involved, such as the
> showing of double features, gift nights, give-aways, premiums,
> cut-rate tickets, lotteries, etc.;
> (4) The rental terms and license fees paid by the theatres involved
> and the revenues derived by the distributor-defendant from such
> theatres;
> (5) The extent to which the theatres involved compete with each
> other for patronage;
> (6) The fact that such a theatre involved is affiliated with a
> defendant-distributor or with an independent circuit of theatres
> should be disregarded; and
> (7) There should be no clearance between theatres not in
> substantial competition.

Id. at 145-46.  In fact, Plaintiffs actually admit that, under Paramount, clearance agreements are

lawful "where (1) the clearing and cleared theatres are in 'substantial competition with each

other; (2) the clearance is not broader in scope than made necessary by the 'special needs' of the

clearing theatre; and (3) the clearance does not harm consumers." (See Pls.' Mem. Law Opp'n 46.

citing Paramount, 334 U.S. at 147-48)  Thus, the mere fact that Regal entered into clearance

agreements with its distributors does not subject Regal to liability under Section 1.

        As a threshold matter, Defendants contend that there is no evidence that clearance

agreements exist between Regal and its distributors.  There is evidence, however, that films

playing at the Union Square 14 do not play simultaneously at the Village East, and have not

since the Union Square 14 opened for business in November 1998. (See Keeley Aff., Ex. 2

(Regal's Req. for Admiss. No. 11) & Ex. 3 (Paramount's Req. for Admiss. No. 8).)  A reasonable

jury could infer from this evidence that distributors have agreed with Regal not to license movies day and date to the Village East.  Thus, the Court will assume that Plaintiffs' evidence might be sufficient to create a disputed issue of material fact.

Plaintiffs' argument about clearance agreements between the Union Square 14 and the Village East, however, is a major shift from its position on competition within the LMZ. Plaintiffs admit that Union Square 14 and the Village East are in substantial competition; indeed that is the premise for Plaintiffs' market definition. (See Pls.' Mem. Law Opp'n 33-35.)  In that context, Plaintiffs asked the Court to accept as true that "the LMZ is an area of effective competition," and therefore is a proper geographic market for purposes of this litigation. (Id.) Plaintiffs shift course in the context of clearance agreements.  The apparent explanation for this sudden reversal is that if the Union Square 14 and the Village East, both of which are in the LMZ, are in substantial competition, then under Paramount the clearances are reasonable. Plaintiffs cannot have it both ways.  The Union Square 14 and the Village East are a mere three and one-half blocks away from one another.  Regal is correct that, in accordance with Paramount, no court has ever found a clearance agreement involving theatres so close to one another to be unlawful.  This is because theatres three and one-half blocks apart are in substantial competition with one another—especially in a major city like New York, in which people commonly walk three and one-half blocks (or more) to get groceries, eat at restaurants, or seek out entertainment options.[18]

_____

[18] In opposition to such a finding, Plaintiffs point to the fact that "a number of theatres in Manhattan play day and date with each other that are approximately the same 0.4 mile walking distance from one another as are the [Union Square 14] and the [Village East]." (Pls.' Mem. Law Opp'n 22.)  This statement confuses the issue.  Clearance agreements are contractual arrangements, to be negotiated

Plaintiffs also claim that "the use of clearance agreements has diminished significantly in recent years because distributors seek to license films, especially TCFs, to as many theatres as possible." (Pls.' Mem. Law Opp'n 20.)  Plaintiffs are implying that the reasonableness of clearance agreements has diminished along with their use.  This argument flies in the face of the evidence.  The Village East has requested or entered into clearance agreements on numerous occasions.  In fact, when the Union Square 14 first opened, the Village East refused to play day and date with the new theatre. (See Smerling Dep. 83.)  Obviously, at that time, the Village East did not believe clearance agreements against the Union Square 14 to be unreasonable.  Only when that strategy backfired, because distributors preferred to license films to the Union Square 14 rather than to Village East, did the Village East change its tune. (Id.)  Furthermore, the Village East admitted that it has clearance agreements against the Loews Village VII, the other first-run theatre in the LMZ.  (See id. 83.)  Plaintiffs provide no explanation as to why refusing to play day and date between the Village East and the Loews Village VII two blocks away is reasonable, but refusing to play day and date between the Village East and the Union Square 14, three and one-half blocks away, is not.

Lastly, Plaintiffs argue that distributors could make more money playing movies if the Village East were allowed to play day and date with Union Square 14.  This statement is wholly speculative.  Plaintiffs' argument here is that it costs only $1,200 to distribute an additional print of a film. (Pls.' Mem. Law Opp'n 23.)  But the print cost is hardly the only cost

---

—within the bounds permitted under Paramount—between an exhibitor and a distributor at the time of licensing.  The simple fact that some theatres choose not to negotiate clearance agreements against nearby theatres does not render clearance agreements between other theatres—such as the Union Square 14 and the Village East—unreasonable under the Sherman Act.

to a distributor when determining the cost of an additional print.  Indeed, Plaintiffs state that it is an insignificant cost. (Pls.' 56.1 Statement Resp. No. 11.)  However, given how film rents are negotiated between exhibitors and distributors, there are other far more substantial costs that the distributors must bear, such as the house allowance and the risk that a lower gross by the theatre will result in settlement at a lower percentage to the distributor if movies are licensed to two different theatres.  Furthermore, Paramount makes clear that clearance agreements are also intended to protect the licensee, i.e., the exhibitor. See 334 U.S. at 147.  Thus, the cost of an additional print to the distributor is almost meaningless in determining reasonableness.

Looking at all the evidence in the light most favorable to the Plaintiffs, including the theatres' proximity to one another, Village East's own practices with the AMC Loews Village VII at 11th Street and the Village East's initial position with Union Square 14, there is no reason why clearance agreements between the Union Square 14 and the Village East should be declared unreasonable.  Even if Village East is denied certain films, as already explained, injury to the Village East as a competitor is not the concern of the antitrust laws.  The Union Square 14 and the Village East are in the same film zone, just a short three and one-half blocks away from one another.  Thus, it is reasonable to believe that the two theatres are in substantial competition with one another, so that playing the same movie, on the same days and times, at both theatres, would likely deny revenue to the clearing theatre.  Furthermore, distributors often play the same film at the Union Square 14 and other nearby theatres outside the LMZ, particularly the Loews 19th Street, across the street from the LMZ.  This is significant in two ways.  First, it demonstrates that moviegoers have some choice of where to go when they want to see a particular movie.  Thus, the clearance agreements do not harm consumers (at least not in a

32

legally significant way).  While such agreements may deny moviegoers the opportunity to see

certain films at the Village East, forcing a moviegoer to see a film at his second choice location

is also not the concern of the antitrust laws.  See, e.g., Six West Retail Acquisition, Inc., 2004

WL 691680, at *10.  Second, because films are already played simultaneously at the Union

Square 14 and other nearby theatres, there is already significant competition for revenues on

particular films.  If distributors then added the Village East, the same movie would be playing at

three local theatres, thereby reducing revenue to each theatre even further.  Given how revenues

and film rents are calculated in the industry, this would hurt both the clearing theatres and the

distributors.  Nothing in the Sherman Act requires the distributors and exhibitors to sacrifice

revenues so that the Village East can gain additional films.

III. CLAYTON ACT CLAIM

                    In addition to Sherman Act violations, Plaintiffs have also alleged violations of

the Clayton Act.  At the time that Plaintiffs filed this action, Oaktree executives served on the

Boards of Directors of both Regal and Loews, which are direct competitor companies: Oaktree's

President, Bruce Karsh, served on the Board of Directors of Loews and Oaktree's Principal,

Stephen Kaplan, served on the Board of Directors of Regal.  Plaintiffs alleged in their Amended

Complaint that this interlocking directorate violated Section 8 of the Clayton Act, 15 U.S.C. §

19, because "[t]he combined capital, surplus, and undivided profit of each of Regal and Loews

exceeds the statutory threshold as set by the Federal Trade Commission pursuant to Section 8 of

the Clayton Act." (Am. Compl. ¶ 105.)  While Oaktree is no longer a defendant in this action,

and no longer sits on the Board of Directors of Loews, Plaintiffs continue their Clayton Act

claim against Regal, asking the Court for an injunction prohibiting Regal from allowing a similar

interlocking directorate in the future.  Plaintiffs' Clayton Act claim was mooted by Oaktree's

resignation from Loews Board of Directors, however, and therefore the Court will not entertain

Plaintiffs' request for injunctive relief.

        Under Article III of the United States Constitution, federal courts may entertain

only "cases or controversies." U.S. Const. art. III.  The Supreme Court has interpreted the "cases

or controversies" clause of Article III to expressly prohibit the issuance of advisory opinions,

which includes the granting of injunctive relief against conduct that previously ceased. See Aetna

Life Ins. Co. of Hartford v. Haworth, 300 U.S. 227, 240-41 (1937).  The distant possibility that

one of the allegedly offending entities will engage in similar conduct in the future is not

sufficient to keep a once-active controversy from becoming moot.  Any interlocking directorate

that may have existed in the past ceased when Karsh resigned from the Loews Board in June

2003 and Oaktree sold its interest in Loews in July 2004.  There is no reason to believe that

Oaktree and Regal would engage in similar conduct in the future.  The probability that Regal

would seek out someone already on the Loews board and appoint that person (or entity) to its

board in order to create an interlocking directorate is extremely remote.  Thus, Plaintiffs request

for injunctive relief against Regal is moot.

        Plaintiffs argue that Regal's Clayton Act violation is capable of repetition, yet

evading review, and therefore the Court may review the claim.  As support for this argument,

Plaintiff draws the Court's attention to the fact that Oaktree did not cease its interlocking

directorate until after the filing of this action and after the Department of Justice ("DOJ")

intervened.  Plaintiffs misconstrue the law.

        The Supreme Court has held that a court may review a claim, even if the allegedly

violating conduct has ceased prior to review, if there is a "reasonable expectation that the wrong will be repeated." United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953) (quoting United States v. Aluminium Co. of Am., 148 F.2d 416, 448 (2d Cir. 1945)).  This exception is usually applied where the alleged violator voluntarily ceases the offending conduct prior to, or upon the filing of, a lawsuit, in order to avoid the lawsuit, yet the violator is free to repeat the conduct in the future if the court dismisses the lawsuit as moot. See, e.g., W.T. Grant Co., 345 U.S. at 632 n.5 ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." (quoting United States v. Or. State Med. Society, 343 U.S. 326, 333 (1952)).  The burden is on the party alleging a threat of repetition to establish that injunctive relief is still necessary, however, and the burden is high. See W.T. Grant Co., 345 U.S. at 633; see also SCM Corp. v. FTC, 565 F.2d 807, 812-13 (2d Cir. 1977) (affirming W.T. Grant standard, and remanding case to FTC where commission had placed burden on Respondent company to demonstrate that violations will not occur). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." Id.

    Despite Plaintiffs' urgings to the contrary, the fact that Oaktree's executive resigned from the Loews Board of Directors only after Plaintiffs commenced this lawsuit does not establish a "cognizable danger of recurrent violation."  First, Oaktree's resignation was not a voluntary withdrawal intended to avoid this lawsuit, but was the result of DOJ intervention. (See Karsh Dep. 262-64.)  There is no reason to believe that the DOJ would not intervene again if a similar interlocking directorate was created in the future.  Second, the possibility that Regal

would establish an interlocking directorate between itself and Loews was substantially

diminished when Oaktree divested all interest in Loews in July 2004. (See Polansky Aff., Ex.

58.)  In light of these facts, the Court finds no "cognizable danger of recurrent violation,"

therefore declines to consider injunctive relief against Regal.

Plaintiffs' reliance on SCM Corp. v. FTC, 612 F.2d 707 (2d Cir. 1980), is

misguided.  In SCM Corp., the Second Circuit upheld the imposition of a cease-and-desist order

by the Federal Trade Commission ("FTC") based on a violation of Section 8 of the Clayton Act,

even though the interlocking director had already resigned from the Respondent company.

Plaintiffs argue that this holding is proof that their case is not moot under the law of this Circuit.

This is wholly inaccurate.  Unlike this case, in SCM Corp., the company that the interlocking

director worked for still had an interest in the Respondent company at the time the Second

Circuit reviewed the case.  Also unlike our case, in SCM Corp. there was no evidence—other

than Defendant's own promise that it would not repeat the offending conduct—that the company

would not seek a similar interlock in the future.  Thus, the cases are easily distinguishable on

their facts.

Moreover, SCM Corp. holds only that the FTC can issue a cease-and-desist order

against Section 8 interlocks after a director resigns.  This is different than saying that a federal

Article III court can review a private Section 8 claim, and issue an injunction against possible

conduct in the future, even though the alleged interlocking directorate no longer exists.  If

anything, SCM Corp. supports Regal's position, because it demonstrates that if there is, in fact, a

cognizable danger that Regal (or Oaktree) will attempt an interlocking directorate in the future,

the DOJ or the FTC will step in and issue a cease-and-desist order, thereby negating any need for

this Court's intervention.

IV. STATE LAW CLAIMS

    A. Donnelly Act Claim

        The Donnelly Act, N.Y. Gen. Bus. Law § 340, was "modeled on the Federal Sherman Act of 1890," and therefore "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." X.L.O. Concrete Corp. v. Rivergate Corp., 83 N.Y.2d 513, 528 (1994) (internal quotation marks omitted).  Village East has not argued that any special state policy or any provision unique to the Donnelly Act requires a different result with respect to its Donnelly Act claims.  In light of the Court's determination on Plaintiffs' Sherman Act claims, Plaintiffs' claims under the Donnelly Act must fail as well.

    B. Tortious Interference with Prospective Business Relations

        To establish a claim for tortious interference with prospective business relations under New York law, a plaintiff must prove four elements: (1) there was a business relationship with a third party; (2) defendants knew of that relationship and intentionally interfered with it; (3) defendants either acted solely out of malice or used wrongful means; and (4) defendants' interference caused injury to the relationship with the third party. See Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003); see also Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004) (answering certified questions from Second Circuit).  The Court is willing to accept, for purposes of this motion, that Plaintiffs make out the first, second and fourth elements, as Plaintiffs had on-going business relationships with movie distributors, Regal knew of these relationships, and Regal's entrance into the market caused these relationships to decline.  But Plaintiffs present

37

absolutely no evidence that Regal acted "solely with malice"[19] or through the use of wrongful conduct,[20] and therefore Plaintiffs tortious inference with prospective business relations claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Defendant Regal Entertainment Group's motion for summary judgment is GRANTED in its entirety. Plaintiffs' claims pursuant to Section 1 of the Sherman Act and Section 8 of the Clayton Act are DISMISSED with prejudice. Plaintiffs' New York state claims for violation of the Donnelly Act and tortious interference with prospective business relations are also DISMISSED with prejudice. The Clerk of the Court is directed to enter judgment and close out this case.

Dated: New York, New York
       January 8, 2007

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

[19] Under New York law, proof that a defendant was motivated by "self-interest or other economic considerations" will not suffice to make out a claim for tortious interference with prospective business relations. See, e.g., Shared Commc'ns. Servs. of ESR, Inc. v. Goldman Sachs & Co., 23 A.D.3d 162, 163 (1st Dep't 2005). In fact, evidence of self-interest serves to rebut any allegations of malice. See id. There is no doubt that Regal's relationships with distributors were motivated by Regal's own economic self-interest, and therefore Plaintiffs cannot establish malice.

[20] The Court assumes that the wrongful conduct alleged by Plaintiffs was unlawful licensing agreements in violation of the Sherman Act. Because the Court finds that Regal has not violated the Sherman Act, however, these allegations do not suffice to make out a claim for tortious interference with prospective business relations. Plaintiffs' failure to identify any wrongful conduct by Regal is fatal to its claim.

38